IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 08-535 |
| | : | |
| HENNARD BENNETT | : | |

## MEMORANDUM

**Juan R. Sánchez, Judge**                                         **April  8, 2010**

On September 9, 2008, Defendant Hennard Bennett was charged in a two-count indictment

with interfering with commerce by attempted robbery, in violation of 18 U.S.C. § 1951(a), and

carrying a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).  Bennett

asks this Court to suppress physical evidence recovered during his arrest as well as identifications

of Bennett made by two eyewitnesses.

Bennett argues his arrest, the witnesses' identification of him, and the search of his

backpack violated his Constitutional rights.   He argues his Fourth Amendment rights were

violated by his initial stop and seizure as he ran down Felton Street and were violated by the

warrantless search of the backpack he carried.  He also argues his Due Process rights were violated

because the show-up  identification procedure police employed following his arrest was unduly

suggestive. This Court finds police officers properly stopped and arrested Bennett as he fled down

Felton Street.  The Court further finds that, although the identification process used in Bennett's

case was unduly suggestive, Thorne-Tucker's identification of Bennett is sufficiently reliable for

use at trial.  Thus, Bennett's motion to suppress her identification of him at the scene of his arrest

will be denied.  Finally, this Court finds police officers violated Bennett's Fourth Amendment

rights through the warrantless search of the backpack he was carrying, therefore Bennett's motion to suppress physical evidence found in the backpack will be granted.

**FINDINGS OF FACT**

1. On March 13, 2008, at approximately 9:45 a.m., Erica Jefferson, an employee of Ace Check Cashing (Ace), arrived at the Ace location at 559 N. 63rd Street in Philadelphia, Pennsylvania to open the store for the day. As Jefferson unlocked the door to Ace, a man pushed her into the store. The man then followed Jefferson inside.

2. Mary Thorne-Tucker, an Ace customer, was standing outside the store around 9:45 a.m. She was one of a group of people who had formed a line outside while waiting for Ace to open. The man who pushed Jefferson inside was also among the group of people waiting for the store to open. Thorne-Tucker saw the man push Jefferson into the store. After a few seconds had passed, Thorne-Tucker grew concerned for Jefferson and entered the store to make sure she was okay.

3. Immediately inside of Ace's front door, there is a door which permits access from the entrance and lobby area into a glassed-in employee-only area. Thorne-Tucker observed Jefferson and the male individual standing near this door. The man was standing close behind Jefferson and appeared to be trying to force her to open the door so he could gain access to the employee-only area.

4. Thorne-Tucker observed Jefferson fumble with her keys, and then drop them. The man picked up the keys and returned them to Jefferson.

5. During this time, Thorne-Tucker heard the store's security alarm system counting down. Jefferson said she needed to disarm the alarm, but the man told her not to touch it. A few seconds later, the alarm went off.

6. Once the alarm sounded, the male immediately moved away from Jefferson, and exited the store. He walked past Thorne-Tucker as he left, and she observed he was a light-skinned African-American man with facial hair, wearing a brown or blue zip-up hooded sweatshirt, and carrying a dark brown or black backpack. Thorne-Tucker did not see the man's eyes because the upper half of his face was covered.

7. After the man left, Jefferson ran out of the building screaming and told the waiting customers that the man had tried to rob her.

8. Thorne-Tucker watched the suspect walk down 63rd Street. She followed the man and saw him walk across a vacant lot. At this point, Thorne-Tucker called 911 and related her observations to police. She said a man tried to rob the store and had walked across a vacant lot on 63rd Street. Thorne-Tucker lived near the Ace location, and was familiar with the neighborhood. She told police the man might be headed toward Felton Street or traveling south on Felton Street.

9. Police officers promptly arrived at the Ace location, and a few minutes after she placed the 911 call, an officer told Thorne-Tucker that the robbery suspect had been caught. Philadelphia Police Officer Thomasina Rozier then drove Thorne-Tucker and Jefferson to Felton Street, the location of Bennett's arrest.

10. Philadelphia Police Officer Andrew Prosser was on duty the morning of March 13, 2008. He heard a report over his police radio of a robbery in progress at the Ace location at 63rd Street and Haverford Avenue. Information from the police radio described the robbery suspect as an African-American male wearing a black hooded sweatshirt, black boots, a blue shirt and blue pants, and he was carrying a tan backpack. The radio report said the man was possibly armed with a handgun.

11. When Officer Prosser received this information, his vehicle was parked within three blocks of the Ace location, at the corner of Stiles Street and 62nd Street.

12. Officer Prosser immediately drove to Ace. When he arrived, Officer Rozier told him to proceed eastbound on Haverford Avenue to the 400 block of North Felton Street. Immediately after Officer Prosser turned from Haverford Avenue onto Felton Street he saw Bennett running south down the 400 block of Felton Street. Bennett was wearing a black hooded sweatshirt, a black hat, blue pants, and black boots, and he was carrying a tan backpack. Approximately ten seconds passed between when Officer Prosser originally heard the radio information and when he saw Bennett running down Felton Street.

13. Once Officer Prosser observed Bennett, he activated his lights and sirens and announced over police radio that he was pursuing a robbery suspect on Felton Street. When he neared Bennett, Officer Prosser exited the car, and yelled at to Bennett to stop running and show both of his hands. Bennett did not immediately stop, but moved away from Officer Prosser. Within seconds, another officer who had arrived on the scene, Officer Thomas Harris, tackled Bennett.

14. Officer Harris also had heard the police radio information reporting a robbery in progress at the Ace on North 63rd Street and subsequently began driving toward Felton Street. As soon as Officer Harris saw Bennett, he exited his vehicle and tackled Bennett.

15. When Officer Harris tackled Bennett, Officer Prosser drew his gun and kept it pointed at Bennett.

16. When Officer Harris tackled Bennett, the backpack Bennett was carrying fell off his shoulder.

17. Upon tackling Bennett, Officer Harris pinned him down, frisked him, and arrested him, placing him in handcuffs.

18.  After handcuffing Bennett, Officer Harris picked up the backpack from the ground. At this point, a number of other officers had arrived at the scene and surrounded Bennett. When Officer Harris picked up the backpack, he noticed it was heavy. He squeezed the backpack and felt something gun-shaped inside.

19.  Officer Harris unzipped the bag and observed a black handgun inside, loaded with fifteen rounds of ammunition. He also observed duct tape and a pair of scissors. Officer Harris removed the ammunition from the firearm.

20.  When Thorne-Tucker and Jefferson arrived at Felton Street, Bennett was sitting in the back of a police car. An officer took Bennett out of the car in handcuffs so that Thorne-Tucker and Jefferson could see him. When Bennett was originally taken out of the car, the hood of his sweatshirt was not on his head, and he was not wearing a backpack. Thorne-Tucker could not immediately identify him. She told police to pull Bennett's hood up and place a backpack on his back. Once Bennett's hood was over his head and the backpack was placed on his back, Thorne-Tucker was able to positively identify him.

21.  After Bennett was identified by Thorne-Tucker and Jefferson, the evidence discovered inside the backpack was taken to police district headquarters at 61st and Thompson Streets. At district headquarters, Officer Harris completed two property receipts for the evidence; one that listed the gun and one that listed the backpack, duct tape, and scissors.

22.  Officer Prosser testified that whenever items are recovered, either from victims or defendants, or discovered as found property, it is his practice to place those items on property receipts for safe-keeping and for possible use as evidence.

23. Sergeant Michael Frisco has been employed by the Philadelphia Police Department for over 27 years. He testified he has been trained by the police department to conduct general police practices, including completing paperwork, processing arrests, and processing crime scenes. Sergeant Frisco testified that, as part of this training, he learned how to gather and process evidence found at a crime scene. He testified that different categories of evidence, including narcotics and firearms, are directed to different locations after being recovered from a crime scene.

24. According to Sgt. Frisco, the proper method of collecting, cataloguing, and storing firearm evidence was followed in this case.

**DISCUSSION**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Bennett contends his Fourth Amendment rights were initially violated when Officer Prosser stopped him on the street, arguing the officer lacked reasonable suspicion to warrant even an investigatory stop.

An officer may conduct a brief, investigatory stop when the officer has reasonable suspicion, based on articulable facts, that the suspect has committed a crime. *See United States v. Coker*, 223 Fed. Appx. 136, 139 (3d Cir. 2007) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Courts use a "totality of the circumstances" test to determine if reasonable suspicion existed at the time of a police encounter. Police officers can rely on information given by a witness or an informant to justify an investigatory stop if such information is reliable. *Adams v. Williams*, 407 U.S. 143, 146-47 (1972); *See also Alabama v. White*, 496 U.S. 325, 328 (1990) (rejecting argument that "reasonable cause

6

for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person"). "A witness' recent report carries with it a strong indicia of reliability." *Coker*, 223 Fed. Appx. at 139 (citing *United States v. Nelson*, 284 F.3d 472, 482 (3d Cir. 2002) (attaching "great weight to the fact that the informant had just witnessed a crime" in evaluating the reliability of the informant's tip)). A court may also consider the temporal and geographic proximity of the suspect to a crime scene and the similarity between the suspect's physical appearance and the details of the reported descriptions of the suspect. *See United States v. Harple*, 202 F.3d 194, 196 (3d Cir. 1999).

On the morning of March 13, 2008, Officer Prosser heard a report over police radio of a robbery in progress at 63rd Street and Haverford Avenue in Philadelphia, Pennsylvania. The radio report stated the robbery suspect was possibly armed, and described the suspect as an African-American male wearing a black hooded sweatshirt, black boots, a blue shirt, and blue pants, and carrying a tan backpack. This information was provided by a witness at the crime scene, Mary Thorne-Tucker, who observed the suspect during the course of the attempted robbery. Officer Prosser arrived at the attempted robbery location less than a minute after hearing the radio report. At the crime scene, he briefly spoke with another police officer, Officer Thomasina Rozier, who told Prosser to pursue the suspect, believed by Thorne-Tucker to be heading south on Felton Street, a few blocks from the crime scene. Approximately ten seconds later, Officer Prosser observed Bennett running south on Felton Street. Officer Prosser noticed that Bennett was wearing a black hooded sweatshirt, black boots and blue pants and was carrying a tan backpack.

When Officer Prosser stopped Bennett, he had ample reasonable suspicion to believe that Bennett had recently committed a crime. Bennett matched the description of the suspect given by a witness

to the crime, and he was observed running near, and in the opposite direction from, the crime scene within minutes after the attempted robbery took place. Thus, Officer Prosser's stop of Bennett was lawful.

Officer Prosser exited his police vehicle and yelled at Bennett to stop running and show his hands. Bennett did not heed Officer Prosser's instructions, but instead continued to move away from Officer Prosser. Bennett was eventually stopped when Officer Thomas Harris tackled him. Subsequently, Officers Harris and Prosser placed Bennett under arrest.

Probable cause is required to make a warrantless arrest. "It is 'well established that where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers generally no longer have mere reasonable suspicion, but probable cause to arrest.'" *United States v. Laville*, 480 F.3d 187, 195 (3d Cir. 2007) (citing *United States v. Sharpe*, 470 U.S. 675, 705 (1985)) (citations omitted). The subsequent arrest of Bennett was thus also lawful, because probable cause for Bennett's arrest existed because of Bennett's geographic and temporal proximity to the crime scene, his physical similarity with the robbery suspect, as described by a witness to the crime, and his attempt to flee when Officer Prosser told him to stop running.

Bennett next asks this Court to suppress physical evidence found in the backpack he was carrying at the time of arrest. Bennett argues this evidence was discovered during an illegal search, because the police officer's search of the backpack was conducted after Bennett was already handcuffed, and the backpack was not on his person or within his immediate control.

It is undisputed that the police officers did not have a warrant to search Bennett's backpack. The Fourth Amendment affords protections against unreasonable searches and seizures of a person's

"effects." U.S. Const. amend. IV. "Accordingly, a warrantless search of a closed [backpack] is an unreasonable search under the Fourth Amendment unless it is justified by one of the recognized exceptions to the warrant requirement." *United States v. Rivera-Padilla*, No. 07-4093, 2010 U.S. App. LEXIS 3125, at *4 (3d Cir. 2010). One such exception is a search incident to arrest. *See Arizona v. Gant*, 129 S. Ct. 1710 (2009). Searches incident to arrest are permitted "to disarm a suspect in order to take him into custody," and "to preserve evidence for later use at trial." *Knowles v. Iowa*, 525 U.S. 113, 116 (1998). "[P]olice may search incident to arrest only the space within an arrestee's 'immediate control,' meaning 'the area from within which he might gain possession of a weapon or destructible evidence." *Gant*, 129 S. Ct. at 1714 (citing *Chimel v. California*, 395 U.S. 752, 763 (1960)). In determining if an object is "conceivably accessible to the arrestee," a court is to assume "[the arrestee] was neither an acrobat [nor] a Houdini." *United States v. Myers*, 308 F.3d 251, 267 (3d Cir. 2002) (citations omitted). In *Myers*, when police officers searched a bag which was three feet away from the arrestee while the arrestee was handcuffed, lying face down on the floor, and was "covered" by two armed police officers. *Id.* The Third Circuit held, under these circumstances, the bag was not within the arrestee's immediate control and possession and thus a search of the bag incident to arrest was not justified. *Id.*

*Myers* is factually similar to this case. Officer Harris testified that when he tackled Bennett, the backpack fell off of Bennett's shoulder. While Officer Harris briefly struggled with Bennett on the ground, Officer Prosser drew his gun and kept the gun pointed at Bennett. Officer Harris gained control of Bennett by pinning him to the ground. He then frisked Bennett and placed him under arrest. By the time Bennett was handcuffed, a number of other officers had arrived at the scene. After Bennett was handcuffed and surrounded by police officers, Officer Harris picked up the backpack from the

ground and searched it.  Because this Court assumes Bennett is neither an acrobat nor a Houdini,

Officer Harris's search of the backpack at this point was not a valid search incident to arrest because

the backpack was no longer within Bennett's immediate control.  *See Gant*, 129 S. Ct. at 1716

(explaining "[i]f there is no possibility that an arrestee could reach into the area that law enforcement

officers seek to search, both justifications for the search-incident-to-arrest exception are absent and

the rule does not apply") (citations omitted).  Indeed, the government conceded that, at the time

Bennett was handcuffed, he no longer had access to the backpack.[1]

---

[1]  The following exchange occurred at the October 7, 2009, Suppression Hearing:

> The Court: But he's restrained.  He's restrained.  They pat him down and they're not finding any guns on him and he's restrained.  Are you arguing to me that he has access to that gun?
> Government: I'm saying he may, because at this time I mean –
> The Court: Isn't that a stretch?
> Government: I would say, Judge, yes, it is a stretch, but – and when you talk to these police officers in the situation that they face out in the street . . .
> . . .
> The Court: Tell me, how did that pose a danger to the officers at the scene?  He's handcuffed; he doesn't have access to the gun.  Tell me how– explain to me why [that will] be a threat to them.
> . . .
> Government: Because I'm thinking he could use force and try to get to his firearm; that's what I'm saying.
> The Court: But how is he going to be able to use it?
> Government: I can't answer that question.
> The Court: His Hands are behind his back.
> Government: I can't answer that.  That's a–
> The Court: You can't answer that question because you concede he can't get access to the gun, right?
> Government: Chances are he can't get access to it.  But the officers at the time, they don't know that and they're taking every precaution to search and trying to find that gun.  But, yes, standing before you, no, I cannot articulate . . . how he [could gain] access to the gun.

Tr. at 39-41.

Officer Harris's search of the bag is also not a valid search arising from a *Terry* stop. Under *Terry v. Ohio*, 392 U.S. 1 (1968), police officers may conduct a limited pat-down of "the outer clothing" of a suspect. *Id.* at 31. A *Terry* frisk is invalid, however, when it is extends to a pat-down of a suspect's belongings. *See Bond v. United States*, 529 U.S. 334, 339 (2000) (holding agent's squeezing and physical manipulation of a suspect's bag violated the Fourth Amendment). The Court finds the warrantless search of Bennett's backpack is not subject to any of the recognized exceptions to the warrant requirement.

Evidence found during a warrantless search may not be subject to the exclusionary rule, however, if the inevitable discovery doctrine applies. The inevitable discovery doctrine permits introduction at trial of evidence obtained during an illegal search "if the government can prove that the evidence would have been obtained inevitably, and therefore would have been admitted regardless of any overreaching by the police." *Nix v. Williams*, 467 U.S. 431, 447 (1984) (holding). The government can meet this burden by showing, by a preponderance of the evidence, "that the police, following routine procedures, would inevitably have discovered the evidence." *United States v. De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998) (reasoning that '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received, " *see id.*).

The government may meet its burden under the inevitable discovery doctrine if the government introduces evidence showing that, absent the warrantless search, the evidence would have been uncovered pursuant to a routine inventory search. *See United States v. Morris*, 179 Fed. Appx. 825 (3d Cir. 2006). Inventory searches are constitutionally permissible to serve "three distinct needs: the

protection of the owner's property while it remains in police custody, the protection [of] the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) (internal citations omitted). To satisfy the dictates of the Fourth Amendment, an inventory search must be administered in good faith and must be conducted pursuant to reasonable police regulations. *Colorado v. Bertine*, 479 U.S. 367, 374 (1987).

Standardized criteria, or an established routine, must regulate a police department's policy of opening containers found during inventory searches. *Florida v. Wells*, 495 U.S. 1, 4 (1990). This requirement is "based on the general principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Id.* Standardized criteria for an inventory search need not be absolute and can give police officers "latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself." *Id.* Thus, it is "permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors." *Id.* This latitude, however, must be described in a police department's inventory search policy. *See Wells*, 495 U.S. at 4-5 (noting that the highway patrol in that case "had no policy whatever with respect to the opening of closed containers encountered during an inventory search" and holding "that absent such a policy, the instant search was not sufficiently regulated to satisfy the Fourth Amendment"). Without a policy to guide police officers, an inventory search is unconstitutional. *Morris*, 179 Fed. Appx. at 830 (Smith, J., concurring) (interpreting *Wells* and *Bertine*).

The burden of proving by a preponderance of the evidence that the backpack inevitably would have been the subject of an inventory search rests with the government. *De Reyes*, 149 F.3d at 195.

A court's analysis of whether the contested evidence would have been acquired through a lawful search "should focus upon the historical facts capable of ready verification, and not speculatoin." *Id.* (citing *Nix*, 467 U.S. at 444, n.5). The Third Circuit has further admonished: "Inevitable discovery is not an exception to be invoked casually, and if it is to be prevented from swallowing the Fourth Amendment and the exclusionary rule, courts must take care to hold the government to its burden of proof." *Id.* at 196.

In its memorandum to the Court in opposition to Bennett's motion to suppress physical evidence, the Government contends

> Assuming arguendo that [Officer] Harris had not searched the backpack while arresting Bennett, the evidence would have still been inevitably discovered. Witnesses had told police that the robber wore a backpack. At the arrest site, the defendant was identified by the witnesses to the robbery, just minutes after it had taken place, with the aide [sic] of the backpack. Officers Prosser and Harris had probable cause to arrest Bennett. When arrested, Bennett and [the] items in his possession would have been searched incident to arrest and the gun, tape and scissors would have been discovered.

Govt.'s Response to Def.'s Mot. to Suppress Physical Evidence, at *6. As this Court has found the search incident to arrest exception does not validate the warrantless search of Bennett's backpack, the Government is required to come forward with some other evidence proving Philadelphia police, following routine procedures, would have inevitably discovered the evidence.

At the suppression hearing on this motion, the Government called Officers Harris and Prosser. Both officers testified about their involvement in Bennett's arrest. Officer Harris testified that he always searches suspects for his safety and the safety of fellow officers. Tr. of Suppression Hr'g at 9, Oct. 7, 2009. He also testified that items are placed on property receipts "for safekeeping, for evidence, or for property inventory when items are either found or recovered from victims, defendants,

or [are] just found property on the highway." Tr. at 28. Though this testimony establishes Officer Prosser's individual routine practice of searching suspects, it does not establish a police department policy for searching suspects or for searching items found near arrestees at the time of their arrest. Additionally, although Officer Prosser testified that items which are found on the highway are placed on property receipts, this testimony does not address any departmental policy by which police officers open closed containers or zipped-up bags or inventory such items before storing them.

At the close of the hearing, the Government suggested that an inventory search policy may exist by stating, the police "are not just going to leave the contents of the black backpack and store it in a police car. That's part of their procedure, just to secure the evidence." Tr. at 43. Evidence of such a policy, however, was not elicited at the hearing. This Court then directed the Government to produce a witness to address the issue of inventory searches and briefly continued the suppression hearing.

Two days later, on October 9, 2009, the suppression hearing resumed. At this hearing, the Government again called Officer Harris and also called Sergeant Michael Frisco. During the course of this hearing, the Government introduced extensive testimony about the procedure that was followed after police opened Bennett's backpack and seized the contents. Officer Harris testified that ,once he found the firearm within the backpack, he removed the ammunition and placed the firearm on a property receipt. He explained the process of obtaining a property receipt and said that, in this case, two property receipts were obtained, one for the firearm and another for the backpack, duct tape, and scissors. The Government also introduced copies of these property receipts.

Sergeant Frisco testified he has been employed by the Philadelphia Police Department for over 27 years and he has been trained in processing arrests and crime scenes. Sgt. Frisco testified that "[i]n processing the crime scene, we would be instructed on how to hold, maintain a crime scene, what to

do, how to gather the evidence, where the evidence goes, [and] how to fill out the paperwork for the evidence." Tr. of Suppression Hr'g at 11, Oct. 9, 2009. He testified that narcotics and firearms are processed differently from other evidence. He said the evidence found in Bennett's backpack was transported to police district headquarters at 61st and Thompson Streets in Philadelphia, where it was placed on the aforementioned property receipts and serial numbers corresponding to the property receipts were entered into a computerized database. Finally, Sgt. Frisco testified that the Philadelphia Police Department's policy for processing firearm and crime scene evidence was followed in this case. While the Court heard substantial evidence about the specific procedure used in processing the evidence in this case, the Government did not provide evidence of what *would have* occurred absent the warrantless search of the backpack.

This Court received no evidence that, if the backpack had never been searched at the scene of Bennett's arrest, it inevitably would have been searched pursuant to established, routine police procedures. The Government did not submit evidence of any Philadelphia Police Department policy regarding inventory searches, either through submission of the department's written policy or through testimony. Furthermore, the police officers who testified at the suppression hearing did not characterize the search of the backpack as a standard inventory search.

The Court can assume that, had the warrantless search of the bag not taken place, the police would have removed the backpack from the ground and transported it to the police station in the appropriate district. This Court does not, however, have evidence of what would have happened to the unopened backpack once it was transported to the police station. Two possible outcomes come to mind. First, the backpack may have been secured in a police locker, unopened, pending judicial issuance of a warrant to search the backpack. The court has no evidence that such a warrant would

have been applied for or procured, beyond the Court's speculation. Alternatively, the backpack may have been opened, and its contents inventoried, pursuant to an established inventory policy. In the absence of evidence regarding such a policy, this Court cannot find the contents of the backpack would have inevitably been discovered, the Court can only speculate. Any speculation by the Court as to what would have happened in the absence of the warrantless search would be inappropriate. *See Myers*, 308 F.3d at 255 (explaining that courts "do not supply the testimony that the government failed to elicit during [a] suppression hearing" and "must refrain from drawing inferences that are []not supported by the record"). The Court finds the Government has failed to adduce evidence establishing the existence of any Philadelphia Police Department policies or regulations which inevitably would have led to an inventory search of the backpack. The Court is mindful that "Inevitable discovery is not an exception to be invoked casually" and that " courts must take care to hold the government to its burden of proof ." *De Reyes*, 149 F.3d at 196. The Court, therefore, grants Bennett's motion to suppress the physical evidence recovered from his backpack.[2]

Finally, Bennett asks this Court to suppress the identification of him made by Jefferson and Thorne-Tucker, arguing the show-up identification procedure which was employed in his case violated his Due Process rights.

"An identification procedure that is both (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification violates due process." *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006) (citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977) (explaining that the court's

---

[2] This Court will consider a motion to reopen the record of the suppression hearing. While mindful that "courts should be extremely reluctant to grant reopenings," *United States v. Kithcart*, 218 F.3d 213(3d Cir. 2000), if the Government provides a reasonable and adequate explanation for its failure to present the evidence initially, and demonstrates that reopening would not be prejudicial to Bennett, the Court will consider such a motion. *See, id.*

first inquiry when evaluating whether a suspect's due process rights were violated is whether police used an impermissibly suggestive procedure in obtaining an out-of-court identification, and, if so, whether, under the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification)). "Unnecessary suggestiveness 'contains two component parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures.'" *Id.* (citations omitted). An impermissibly suggestive identification procedure can occur during a show-up, in which "a single individual arguably fitting a witness's description is presented to that witness for identification." *Id.* at 138. A show-up procedure is inherently suggestive because it suggests to witnesses that the police believe they have apprehended the perpetrator of the crime. *Brownlee*, 454 F.3d at 138 (citing *Stovall v. Denno*, 388 U.S. 293, 302 (1967) (recognizing that "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a line-up, has been widely condemned")).

After his arrest, Bennett was subject to a "show-up" identification. He was handcuffed and placed in the back of a police patrol car, and two witnesses of the attempted robbery were transported to him. Once the witnesses arrived, they were asked if Bennett was the individual who had attempted to rob the Ace location. The *Brownlee* Court noted the suggestiveness of the show-up identification procedure in that case was exacerbated by three factors. First, "no 'suspect' save [the defendant] was presented to any of the eyewitnesses at any time." *Brownlee*, 454 F.3d at 138. Second, multiple witnesses "were allowed to make identifications while exposed to the suggestive influence of others," and, third, no reason was provided to explain why the defendant and the witnesses "could not have been taken to the police station for a less suggestive line-up or photo array." *Id.*

These factors are similarly present in Bennett's case. First, he was the only suspect presented to the eyewitnesses at any time. Second, he was presented to Jefferson and Thorne-Tucker at the same time. The two women were transported to Bennett's location together, and were asked at the same time whether he was the perpetrator of the attempted robbery. Both women initially said they could not tell if Bennett was the perpetrator. After Bennett's hood was placed on his head and his backpack was placed on his back, Thorne-Tucker identified him as the perpetrator of the robbery. Furthermore, no evidence has been presented in this case as to why Bennett and the two witnesses could not have been taken to the police station so that Bennett could take place in a line-up. *See United States v. Sebetich*, 776 F.2d 412, 420 (3d Cir. 1985) (recommending that a line-up or similar procedure should "be employed whenever necessary to ensure the accuracy and reliability of identifications"). Thus, this Court agrees with Bennett that the show-up procedure employed in his case was unnecessarily suggestive.

A finding of unnecessary suggestiveness does not end this Court's analysis, however. A violation of Due Process occurs only if an identification procedure is both unnecessarily suggestive and creates a risk of misidentification. *United States v. Donzo*, 335 Fed. Appx. 191, 195-96 (3d Cir. 2009) (citing *Brownlee*, 454 F.3d at 137). "A 'suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability, . . . for reliability is the 'linchpin in determining the admissibility of identification testimony.'" *Brownlee*, 454 F.3d at 139 (citations omitted).

To determine whether a show-up identification is reliable, courts examine the identification procedure in light of the totality of the circumstances. In particular, a court must consider: (1) the witness's original opportunity to observe the suspect; (2) the degree of attention during the initial

18

observation; (3) the accuracy of the initial description; (4) the witness's degree of certainty when viewing the suspect at the confrontation; and (5) the lapsed time between the crime and the identification procedure. *Morrison v. Schultz*, 270 Fed. Appx. 111, 116-117 (3d Cir. 2008) (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972); *Brownlee*, 454 F.3d at 139).

In the instant case, the perpetrator of the attempted robbery forced his way into the Ace location as Jefferson opened the location around 9:45 a.m. Thorne-Tucker was waiting immediately outside the door to the location and she saw the suspect force his way inside the store. Thorne-Tucker followed the suspect and Jefferson into the Ace because of her concern for Jefferson's safety. Because of her concern, she was paying significant attention to the perpetrator. Thorne-Tucker observed the perpetrator speaking to Jefferson over a course of a few minutes; during this time, she was within feet of him. The perpetrator came even closer to Thorne-Tucker when he left the store after the security alarm went off. Following the perpetrator's exit, Thorne-Tucker followed the man down the street and watched him turn and walk across a vacant lot. When the suspect was out of view, Thorne-Tucker called 911.

Based on her observation of the suspect, Thorne-Tucker told police the man who had attempted to rob the Ace was an African-American male with a black hooded sweatshirt, black boots, blue pants, and a blue shirt, and who was carrying a tan backpack. This detailed description of the suspect's clothing almost exactly matched the clothing Bennett was wearing when he was stopped by Officers Prosser and Harris. Additionally, less than ten minutes passed between the suspect's attempted robbery of the Ace store and Thorne-Tucker's identification of Bennett at the scene of Bennett's arrest. The only factor which mitigates against reliability in this instance is that Thorne-Tucker did not immediately recognize Bennett as the perpetrator of the crime. When Thorne-Tucker initially observed

Bennett in the back of the police car, he did not have his hood pulled up over his head, did not have his sweatshirt zipped up, and did not have the tan backpack on his back. Thorne-Tucker told police she could not be sure Bennett was the man she observed at Ace until she saw him with his hood on his head and wearing the backpack. The officers complied with Thorne-Tucker's request and had Bennett's clothing adjusted accordingly. When his hood was placed over his head, his sweatshirt zipped up, and his backpack placed on his back, Thorne-Tucker conclusively stated that Bennett was the same person she had observed in the Ace location.

After weighing all of the reliability factors outlined in *Biggers*, this Court finds Thorne-Tucker's identification of Bennett is independently reliable. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). Thus, there was not a substantial likelihood that Thorne-Tucker misidentified Bennett. Therefore, Thorne-Tucker's identification of Bennett is admissible at trial. Any shortcoming in Thorne-Tucker's identification go to weight and not admissibility.

Jefferson, on the other hand, did not testify at the suppression hearing. Therefore, this Court cannot weigh her opportunity to observe Bennett or the strength of her subsequent identification. Thus, evidence of Jefferson's out-of-court identification will be suppressed, and Jefferson will be precluded from identifying Bennett at trial.

## CONCLUSIONS OF LAW

1. Bennett's Fourth Amendment rights were not violated when he was stopped by Officer Prosser because the officer had reasonable suspicion to stop Bennett.

2. Bennett's Fourth Amendment rights were not violated when Officer Harris arrested him, because the officer had probable cause to arrest Bennett.

3. Bennett's Fourth Amendment rights were violated by the warrantless search of his backpack because the warrantless search does not qualify under the search incident to arrest, *Terry* frisk, or inevitable discovery exceptions to the warrant requirement.

4. The identification procedure used in Bennett's case was unduly suggestive, however, the identification made by Thorne-Tucker is sufficiently reliable to be admitted at trial. As this Court heard no testimony from Jefferson, Jefferson's out-of-court identification will not be admitted at trial.

BY THE COURT:

/s/ Juan R. Sánchez
JUAN R. SÁNCHEZ, J.